**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PATRICIA A. STARK, | |
| Plaintiff | CASE NO. |
| v. | |
| JOHNSON & JOHNSON and ETHICON, INC., | |
| Defendants. | |

**COMPLAINT**

Plaintiff, PATRICIA A. STARK ("Plaintiff"), by and through counsel, brings this Complaint ("Complaint") and, Plaintiff alleges as follows:

## I.  PARTIES

**A.**     **Plaintiff**

1.     Plaintiff is a resident of Western Springs, IL.

**B.**     **Defendants**

2.     Defendant, Johnson & Johnson ("J&J") is a corporation, and according to its website, the world's largest and most diverse medical device and diagnostics company, with its worldwide headquarters located at One Johnson & Johnson Plaza, New Brunswick, New Jersey.  Johnson & Johnson organizes its subsidiary businesses into individual Business Units to coordinate the development, manufacture, testing, marketing promotion, training, distribution and sale of its' pelvic floor repair products.  Within J&J there are three sectors, medical devices and diagnostics, pharmaceutical, and consumer.  Within the medical devices and diagnostic sector are "Business Units" including the "Ethicon Franchise."  The Ethicon Franchise was

1

charged by J&J with the design, development, promotion, marketing, testing, training, distribution and sale of the pelvic floor repair products at issue in this case. The Company Group Chairman and Worldwide Franchise Chairman for the Ethicon Franchise, Gary Pruden, is employed by J&J. The companies which comprise the Ethicon Franchise are thus controlled by J&J and include, but are not limited to, Ethicon Inc., Ethicon LLC, Ethicon LTD.

3.     Defendant, Ethicon, Inc., is a wholly owned subsidiary of Defendant Johnson & Johnson located in Somerville, New Jersey.

4.     At all times relevant herein, Defendants were engaged in the business of placing medical devices into the stream of commerce by designing, manufacturing, testing, training, marketing, promoting, packaging, labeling, and/or selling such devices, including the Prolene Mesh/Prolene Soft Mesh, Gynemesh, Gynemesh PS, TVT, TVT-Obturator (TVT-O), TVT-SECUR (TVT-S), TVT Exact, TVT Abbrevo, Prolift, Prolift +M, Prosima and other pelvic mesh products unknown at the present (hereinafter collectively referred to as "Pelvic Mesh Products" or the "Products"). Defendants manufacture, market, advertise, promote and sell Pelvic Mesh Products worldwide. As a result of the coordinated activities of all Defendants named above, Plaintiff was implanted (Good Samaritan Hospital, Downers Grove, IL) on or about February 15, 2007, with a defective pelvic floor mesh repair product by Andrew Roth, M.D.: TVT- Obturator. Further, on or about May 21, 2008, Denise Elser, M.D. implanted in Plaintiff (Good Samaritan Hospital, Downers Grove, IL) another defective pelvic mesh floor product: Gynecare TVT. As of September 2015, there was no exposed mesh as shown by a cystocsopy by Sandra R. Valaitis at that time. However, in October 2015, there was found an erosion of the mesh into the urethral lumen such that Plaintiff was injured in October 2015, due

2

to the mesh implanted in either February 2007 or May 2008, or from both of those implants. In November 2015, Dr. Valaitis, M.D. found erosion of said mesh and Plaintiff underwent surgery at Hinsdale Hosptial to remove the mesh but Dr. Valaitis determined during the surgery she could not excise and remove said mesh due to potential injury to the urethra. Plaintiff did not discover that her injury, nor that her pain and other symptoms in her pelvic area, may be due to a defective pelvic mesh floor product until a conversation with a third party in March, 2018. Until March 2018, Plaintiff was led to believe that any erosions or pelvic area pain and symptoms were due either to the surgery or to the way her body responded to the mesh but in no way before March 2018, was Plaintiff given any information that would lead a reasonable person to conclude that she had been injured by a pelvic mesh floor product,

5. Defendants had a legal duty to ensure the safety and effectiveness of their pelvic mesh products by conducting adequate and well controlled studies on their products prior to marketing. Defendants deliberately chose to manipulate the only studies that were conducted on their products and by so doing provided doctors and patients with false and misleading information about the safety and effectiveness of their pelvic mesh products. Furthermore, Defendants made a conscious decision to forego performing studies and creating registries that would have provided doctors and patients in the United States with accurate information regarding the lack of proof of the safety and effectiveness of their pelvic mesh products.

## II.  JURISDICTION AND VENUE

6. Federal subject matter jurisdiction in the constituent is based upon 28 U.S.C. § 1332(a), in that in each of the constituent actions there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

7.      Defendants have significant contacts with the Northern District of Illinois federal judicial district such that they are subject to the personal jurisdiction of court in said district.

8.      A substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in said federal judicial district. Pursuant to 28 U.S.C. § 1391(a), venue is proper in said district.

### III.   DEFENDANTS' PELVIC MESH PRODUCTS

9.     In or about October, 2002, Defendants began to manufacture, market and sell a product known as Gynemesh, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.  All references to Gynemesh include all variations of or names used for Gynemesh, including but not limited to Gynemesh PS.

10.     Gynemesh was derived from a product known as Prolene Mesh, which was used in the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.  Prolene Mesh was derived from Defendants' Prolene mesh hernia product, and was and is utilized in the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.  All references to Prolene Mesh include all variations of Prolene Mesh, including but not limited to Prolene Soft Mesh.

11.      On or about January l, 2005, without seeking FDA clearance, the Defendants began to market and sell a product known as the Prolift System, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The Prolift System was and is offered as an anterior, posterior, or total repair system, and all references to the Prolift and/or Prolift System include by reference all variations.

4

12.     On or about May, 2008, the Defendants began to market and sell a product known as Prolift+M System, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The Prolift+M System was and is offered as an anterior, posterior, or total repair system, and all references to the Prolift+M and/or Prolift +M System include by reference all variations.

13.     On or about March 2010, Defendants began to market and sell a product known as Prosima System, for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence. The Prosima was and is offered as an anterior, posterior, or total repair system, and all references to Prosima include by reference all variations.

14.     The Defendants market and sell a product known as TVT, for the treatment of stress urinary incontinence in females.  The TVT has been and is offered in multiple and significant variations including, but not limited to, the TVT, TVT-Obturator (TVT-O), TVT-SECUR (TVT-S), TVT Exact and TVT Abbrevo.   All references to TVT include by reference all variations.

15.      As stated above, the products known as Prolene Mesh, Gynemesh, Prolift, Prosima, Prolift+M, and  TVT, as well as any as yet unidentified pelvic mesh products designed and sold for similar purposes, inclusive of the instruments and procedures for implantation, are collectively referenced herein as Defendants' "Pelvic Mesh Products" or the "Products".

16.     Defendants' Pelvic Mesh Products were designed, patented, manufactured, labeled, marketed, sold and distributed by the Defendants, at all times relevant herein.

17.     As stated above, the products known as Prolene Mesh, Gynemesh, Prolift, Prosima, Prolift+M, TVT, as well as any yet unidentified pelvic mesh products designed and

sold for similar purposes, inclusive of the instruments and procedures for implantation, are collectively referenced herein as Defendants' "Pelvic Mesh Products" or the "Products".

## IV.   FACTUAL BACKGROUND

18.     Surgical mesh products have been used to repair abdominal hernias since the 1950s.  In the 1970s, gynecologists began using surgical mesh products designed for hernia repair for abdominal repair to surgically repair prolapsed organs.  In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of pelvic organ prolapse ("POP") and stress urinary incontinence ("SUI").  Manufacturers, including Defendants, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and SUI. Today, defendants sell pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The Products manufactured by Defendants are considered Class II medical devices.

19.     Defendants' Pelvic Mesh Products are targeted for women who suffer from pelvic organ prolapse and stress urinary incontinence as a result of the weakening or damage caused to the walls of the vagina. These products are specifically promoted to physicians and patients as an innovative, minimally invasive procedure with minimal local tissue reactions, minimal tissue trauma and minimal pain while correcting vaginal prolapse, stress urinary incontinence, pelvic organ prolapse and/or rectocele.

20.     Moreover, these Pelvic Mesh Products contain polypropylene mesh. Despite claims that this material is inert, the scientific evidence shows that this mesh material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' Pelvic Mesh Products. This immune response promotes degradation of the polypropylene mesh, as well as the pelvic tissue, and can contribute to the

6

formation of severe adverse reactions to the mesh. Defendants knew when they first began using polypropylene mesh in the hernia applications that the material should not be exposed to strong oxidizers such as hydrogen peroxide. Defendants also knew that hydrogen peroxide is created in the human body as a response to any kind of inflammatory reaction. Despite this knowledge, Defendants chose to continue using polypropylene for its pelvic mesh products, knowing that the mesh would degrade over time. Worse yet, Defendants affirmatively and falsely stated to physicians and to patients that the polypropylene would not degrade in the human body.

21.    At various times, Defendants sought and obtained Food and Drug Administration ("FDA") clearance to market the Pelvic Mesh Products under Section 510(k) of the Medical Device Amendment. Section 510(k) allows marketing of medical devices if the device is deemed substantially equivalent to other legally marketed predicate devices marketed prior to May 28, 1976. This clearance process did not require Defendants to prove the safety or efficacy of the Pelvic Mesh Products and, thus, a formal review of the safety and efficacy of the Pelvic Mesh Products was never conducted with regard to the Products. In the case of the Prolift product, Defendants marketed and sold the product for human implantation for over two years without the necessary clearance under Section 510(k).

22.    Defendants' Pelvic Mesh Products have been and continue to be marketed to the medical community and directly to patients as safe, effective, reliable, medical devices; implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse and/or rectocele, and as safer and more effective as compared to the traditional products and procedures for treatment, and other competing Pelvic Mesh Products.

23.     The Defendants have marketed and sold the Pelvic Mesh Products to the medical community at large and directly to patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and include the provision of valuable cash and non-cash benefits to health care providers. Defendants also utilized documents, patient brochures, and websites, offering exaggerated and misleading expectations as to the safety and utility of the Pelvic Mesh Products. Defendants' further engaged in direct-to-consumer marketing specifically designed to drive consumers to seek out these products for implantation into their bodies.

24.     At all times relevant to this action, Defendants intentionally, recklessly and/or negligently concealed, suppressed, omitted, and misrepresented the risks, dangers, defects, and disadvantages of the Pelvic Mesh Products and advertised, promoted, marketed, sold and distributed the Pelvic Mesh Products as a safe medical device when, in fact, Defendants knew that the Pelvic Mesh Products were not safe for their intended purposes and that the Pelvic Mesh Products would cause, and did cause, serious medical problems, and in some patients, catastrophic and permanent injuries.

25.     For example, Defendants described in its Patient Brochures, Instructions for Use, and other marketing materials, that the known complications for its Pelvic Mesh Products were consistent with any surgical procedure of an implantable medical device and described such occurrences as "rare" and "small" when in fact Defendants knew or should have known that the complications were not "rare nor small" but common, permanent, and debilitating conditions as is evident in the medical literature as well as in Defendants own internal data.

26.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' Pelvic Mesh Products have high malfunction, failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the Plaintiff, making them defective under the law. The Products' defects include, but are not limited to, the following:

    a.  the use of polypropylene material in the mesh itself and the immune reaction that results, causing adverse reactions and injuries;

    b.  the design of the Pelvic Mesh Products to be inserted transvaginally into an area of the body with high levels of bacteria, yeast, and fungus that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

    c.  the procedure itself, which is a part of the Pelvic Mesh Products, requires to the physician to insert the device "blindly," resulting in nerve damage and damage to other internal organs;

    d.  biomechanical issues with the design of the mesh that create strong amounts of friction between the mesh and the underlying tissue that subsequently cause that tissue to degrade resulting in injury;

    e.  the lack of porosity in the mesh resulting in the formation of a scar plate that prohibits tissue in-growth, resulting in mesh contraction, nerve damage, pain, and erosion of the mesh into other organs, and failure of the device;

    f.  the use and design of anchors in the Pelvic Mesh Products which when placed correctly are likely to pass through and injure major nerve routes in the pelvic region;

    g.  degradation of the mesh itself over time which causes the internal tissue to degrade resulting in injury;

    h.  particle loss and or "shedding" of the mesh both during implantation and following implantation that results in additional undesirable complications including an increased inflammatory response and a migration of those particles resulting in injury;

i. the welding and heating of the mesh itself during production which creates a toxic substance that contributes to the degradation of the mesh and host tissue alike;

j. the design of trocars, as devices to insert the Pelvic Mesh Products into the vagina, are defective because the device requires tissue penetration in nerve rich environments which results frequently in the destruction of nerve endings causing pain and other injuries;

k. the propensity of the mesh for "creep", or to gradually elongate and deform when subject to prolonged tension inside the body;

l. the propensity of the mesh for "creep", or to gradually elongate and deform when subject to prolonged tension inside the body;

m. the inelasticity of the mesh, causing them to be improperly matted to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking, sitting); and;

n. the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturer's instructions.

27. Upon information and belief, the Defendants have consistently underreported and withheld information about the propensity of Defendants' Pelvic Mesh Products to fail and cause injury and complications, and have misrepresented the efficacy and safety of the Pelvic Mesh Products, through various means and media, actively and intentionally misleading the FDA, the medical community, patients, and the public at large.

28. Defendants have further deliberately chosen to forego the conduct of studies and registries to avoid reporting obligations that would be mandated under the federal regulations upon receipt of adverse event information.

29. Despite the chronic underreporting of adverse events associated with the Defendants' Pelvic Mesh Products, the underreporting of events associated with similarly

designed competitor products, and Defendants' deliberately avoiding the conduct of studies and registries to avoid the reporting of adverse events, eventually enough complaints were recorded for the FDA to issue a public health notification regarding the dangers of these devices.

30.     By 2008, the FDA became aware of potential safety issues with urogynecologic surgical mesh products through postmarket surveillance of the MAUDE database for medical device reports (MDRs), concerns raised by clinical community and citizens, and the published literature.

31.     On October 20, 2008, the Food and Drug Administration ("FDA") issued a Public Health Notification that described over 1,000 complaints (otherwise known as "adverse events") that had been reported over a three-year period relating to Pelvic Mesh Products. Although the FDA notice did not identify the transvaginal mesh manufacturers by name, a review of the FDA's MAUDE database indicates that the Defendants are one of the manufacturers of the Pelvic Mesh Products that are the subject of the notification.

32.     On October 21, 2008, Defendants prepared a document to help its sales force respond to the FDA Public Health Notification entitled: FDA Notification About Use of Surgical Mesh to Treat Pelvic Organ Prolapse and Stress Urinary Incontinence Standby for Media/Analyst inquiries.  An internal email to Defendant's sales, marketing, regulatory, clinical and medical teams, informed  members of the FDA notifications and instructed not to proactively initiate conversations with customers about the notice and, instead, prepared a "standby statement" for them to use if asked about it.  In answer to a question about the frequency of complications due to Ethicon mesh devices, the planned "answer" was evasive in the extreme, providing no quantitative information despite Ethicon's knowledge of the frequency and severity of complications that occurred during the procedure and, "if pressed" sales reps

were instructed to say the following: "Our TVT family of devices has been used in more than 1 million patients worldwide. Our PROLIFT product has been used in more than 100,000 patients. The reported complication rate is less than 1% for each device." However, the frequency of vaginal mesh exposure with the Prolift procedure alone is an average across studies of at least 10%. Defendants further affirmatively and falsely stated to physician and patients that all of the risks identified in the 2008 safety alert were previously disclosed and warned of in the product labeling for Defendants' mesh products, and that no new risks had been identified.

33.     On July 13, 2011, the FDA issued a Safety Communication:" UPDATE on Serious Complications Associated with Transvaginal Placement of Surgical Mesh for Pelvic Organ Prolapse." Therein, the FDA advised that it had conducted an updated analysis of adverse events reported to the FDA and complications reported in the scientific literature and concluded that surgical mesh used in transvaginal repair of Pelvic Organ Prolapse was an area of "continuing serious concern." The FDA concluded that serious complications associated with surgical mesh for transvaginal repair of Pelvic Organ Prolapse, were "not rare." These serious complications include, but are not limited to neuromuscular problems, vaginal scarring/shrinkage and emotional problems. Many of the serious complications required medical and surgical treatment and hospitalization.

34.     The literature review performed by the FDA found that erosion of mesh through the vagina was the most common and consistently reported mesh-related complication and that such erosions can require multiple surgeries to repair and can be debilitating for some women, with no guarantee that multiple surgeries will resolve the complication.

35.     The FDA concluded in its Safety Communication that it was not clear that transvaginal repair of Pelvic Organ Prolapse with mesh or repair of SUI with mesh kits are more

effective than traditional non mesh repair of pelvic organ prolapse. Further, the FDA conducted a systematic review of the published scientific literature from 1996-2011 and concluded that based thereon, that transvaginal pelvic organ prolapse repair with mesh "does not improve symptomatic results or quality of life over traditional non mesh repair."  The FDA concluded that "a mesh procedure may put the patient at risk for requiring additional surgery or for the development of new complications. Removal of the mesh due to mesh complications may involve multiple surgeries and significantly impair the patient's quality of life. Complete removal of mesh may not be possible."

36.    The information contained in the FDA's Public Health Notification of October 2008 and the FDA Safety Communication of July 13 2011, was known or knowable to Defendants and was not disclosed in oral or written communications, direct to consumer advertising in the form of patient brochures, instructions for use, or labeling.

37. In fact, at the time Defendants began marketing each of its Pelvic Mesh Products, Defendants were aware that its Pelvic Mesh Products were associated with each and every one of the adverse events communicated by the FDA in its July 13, 2011 Safety Communication.

38.    In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh . . .   Some of these women will require surgical

intervention to correct the condition, and some of the pain appears to be intractable.

39. Defendants knew or should have known about the Products' risks and complications identified in the FDA Safety Communication and the ACOG/AUGS Joint Committee Opinion.

40. Defendants also knew or should have known that: (1) some of the predicate products for the Pelvic Mesh Products had high failure and complication rates, resulting in the recall of some of these predicate devices (including a medical device known as Protogen device); (2) that there were and are differences between the Defendants' Pelvic Mesh Products and some or all of the predicate products, rendering them unsuitable for designation as predicate products; (3) that significant differences exist and existed between the Pelvic Mesh Products and their predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and (4) that the Pelvic Mesh Products were and are causing numerous patients severe injuries and complications.

41. The Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, and the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the Pelvic Mesh Products and the procedures for implantation were and are safe and effective, leading to the prescription for and implantation of the Pelvic Mesh Products into Plaintiff.

42.     Defendants' Pelvic Mesh Products are also defective due to Defendants' failure to adequately warn or instruct Plaintiff and/or her health care providers of risks and complications including, but not limited to, the following:

a.  the Products' propensities to contract, retract, and/or shrink inside the body;

b.  the Products' propensities for degradation, fragmentation and/or creep;

c.   the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.   the Products' lack of porosity in preventing proper mating with the pelvic floor and vaginal region;

e.   the  rate and manner of mesh erosion or extrusion;

f.   the risk of chronic inflammation resulting from the Products;

g.   the risk of chronic infections resulting from the Products;

h.   risk of permanent vaginal or pelvic scarring as a result of the Products;

I.   the risk of permanent vaginal shorting as a result of the Products;

j.   risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

k.   the need for corrective or revision surgery to adjust or remove the Products;

l.   the severity of complications that could arise as a result of implantation of the Products;

m.  the hazards associated with the Products;

n.   the Products' defects described herein;

o.  treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

p.  treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

q.  treatment of pelvic organ prolapse and stress urinary incontinence with the Products makes future surgical repair more difficult than feasible available alternatives;

r.  use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

s.  removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

t.  complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain; and

u.  the fact that neither pelvic organ prolapse, nor stress urinary incontinence, are life threatening conditions, and that other options, including non-surgical options, were available and superior alternatives to the use of the Products.

These risks and complications were known to Ethicon through the TVM internal study reports, the medical literature and consultants. In fact, the erosion and shrinkage problems were significant enough that Defendants tried finding ways to address them. Specifically, one of Defendants' Experts, Professor M. Cosson remarked that "polypropylene meshes might not be improvable in terms of shrinkage, we

may need a completely new material." One of Defendants' own consultants informed Ethicon that all heavy weight meshes shrink over time, and that there was no use for heavyweight meshes (such as those used in the TVT products), anywhere in the human body.

43. Defendants also failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of their Pelvic Mesh Products.

44. Defendants failed to design and establish a safe, effective procedure for removal of the Pelvic Mesh Products. Therefore, in the event of a failure, injury, or complications, it is impossible to easily and safely remove the Pelvic Mesh Products.

45. Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation have existed at all times relevant as compared to the Defendants' Pelvic Mesh Products.

46. The Pelvic Mesh Products were at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physicians.

47. Furthermore, the Defendants provided incomplete, insufficient, inadequate, and misleading training and information to physicians, in order to increase the number of physicians utilizing the Pelvic Mesh Products, and thus increase the sales of the Pelvic Mesh Products, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

48. Specifically, and by way of example and not limitation, Defendants, through the use of "thought leaders," physicians, sales representatives and other agents and/or

servants, voluntarily and actively sought to "train" physicians and other health care providers,

including Plaintiff' physicians, on the Pelvic Mesh Products. The purpose of these professional

training programs was to teach physicians how to safety and effectively use the Pelvic Mesh

Products and educate physicians on the potential adverse effects and adverse outcomes

associated with the Products. These professional training programs included information and

instruction supplied with the Instructions for Use, information provided as an adjunct to the

Instructions for Use (e.g., "Key Procedural Steps"), information provided in hands-on or in-

service lab programs (e.g., preceptorship programs), cadaver training sessions, information

provided through slide decks, Powerpoint presentations, surgical technique documents,

instructional DVDs, webcasts, and clinical articles. And, if a physician requested additional

training, Defendants provided that training. Upon information and belief, one or more of these

professional training programs was provided by the Defendants' for all of the Pelvic Mesh

Products. Plaintiff avers that, from the totality of the circumstances such training was woefully

incomplete, insufficient, inadequate, and misleading.

49. The Pelvic Mesh Products implanted into the Plaintiff were in the same or

substantially similar condition as they were when they left the possession of Defendants, and in

the condition directed by and expected by the Defendants.

50. Plaintiff and Plaintiff's physicians foreseeably used and implanted the

Pelvic Mesh Products, and did not misuse or alter the Pelvic Mesh Product in an unforeseeable

manner.

51. The injuries, conditions, and complications suffered by women who have

been implanted with Defendants' Pelvic Mesh Products include, but are not limited to, mesh

erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation,

18

dyspareunia (pain during sexual intercourse), inability to engage in sexual relations, urinary problems, inability to void, blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, shortening of the vagina, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, prolapse of organs, and in many cases the women have been forced to undergo intensive medical treatment, including but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

52.     The medical and scientific literature studying the effects of polypropylene pelvic mesh, like Defendants' Pelvic Mesh Products, have examined each of these injuries, conditions, and complications and determined that they are in fact casually related to the mesh itself and do not often implicate errors related to the implantation of the devices.

53.     Defendants misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public that the Pelvic Mesh Products had been tested and were found to be safe and effective for the purposes of treating incontinence and/or prolapse. Yet, in response to FDA's request of Ethicon, during the 510(k) review, to provide a clinical evaluation for the PROLIFT, Ethicon replied as shown below, along with FDA's request and rationale:

> *"..This complex procedure is proposed to be done in a 'blind' manner through the use of the specialized surgical tools provided in the Gynecare System. Due to the complexity of this procedure and potential high risk for organ perforation, bench testing is not sufficient to demonstrate device safety and efficacy. Please provide a clinical evaluation of your proposed Prolift System to support your Indications for Use."*

"…Ethicon believes that the results of pre-clinical, benchtop testing, and cadaver evaluations, provide evidence of substantial equivalence of the PROLIFT Systems to the

currently marketed GYNEMESH and demonstrate that surgeons can use the device without problems."

54.     In the case of the Prolift device, Defendants misrepresented to the Plaintiff, to the Plaintiff's physicians, and to the medical community at large, that such product had been properly cleared for marketing by the FDA when in fact no such clearance had been sought or obtained.   Specifically, Ethicon made statements in its "standby statement" to the FDA Public Health Notification under the heading of Product Background, where it claimed that "Gynecare Prolift was introduced to the market after FDA clearance in 2005 to treat prolapse." This is, plainly false and misleading.  Prolift was NOT cleared by the FDA before its launch in 2005.  In fact, Ethicon did not receive FDA clearance to market Prolift until May 2008. This claim stands in reckless disregard for the truth and serves to perpetuate the misimpression of physicians and patients that Prolift had been legally marketed at its launch in March 2005.

55.     These representations were made by Defendants with the intent of inducing the medical community, Plaintiff, and the public, to recommend, prescribe, dispense, and purchase the Pelvic Mesh Products for use as a means of treatment for stress urinary incontinence and/or prolapse, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

56.     Defendants failed to undertake their duties to properly know the qualities of their Pelvic Mesh Products and in representations to Plaintiff and/or to Plaintiff's healthcare providers,  and concealed and intentionally omitted the following material information from their IFUs and other marketing materials:

a.     That the Pelvic Mesh Products were not as safe as other products and procedures available to treat incontinence and/or prolapse;

b.    the Pelvic Mesh Products were not as effective as other products and procedures available to treat incontinence and/or prolapse;

c.    That the risk of adverse events with the Pelvic Mesh Products was higher than with other products and procedures available to treat incontinence and/or prolapse;

d.    That the risk of adverse events with the Pelvic Mesh Products were not adequately tested and were known by Defendants;

e.    That the limited clinical testing revealed the Pelvic Mesh Products had a higher risk of adverse effects, in addition to, and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

f.    That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

g.    That Defendants were aware of dangers in the Pelvic Mesh Products in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

h.    That the Pelvic Mesh Products were dangerous and caused adverse side effects, including but not limited to higher incidence of erosion and failure, at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

I.    That patients needed to be monitored more regularly than usual while using the Pelvic Mesh Products and that in the event the Pelvic Mesh

21

Products needed to be removed that the procedures to remove them had a very high failure rate and/or needed to be performed repeatedly; Thus:

j.  That the Pelvic Mesh Products were manufactured negligently;

k.  That the Pelvic Mesh Products were manufactured defectively; and

l.  That the Pelvic Mesh Products were designed negligently, and designed defectively.

57.  Defendants were under a duty to disclose to Plaintiff and Plaintiff's physicians, the defective nature of the Pelvic Mesh Products, including, but not limited to, the heightened risks of erosion, failure and permanent injury.

58.  Defendants had sole access to material facts concerning the defective nature of the Pelvic Mesh Products and their propensity to cause serious and dangerous side effects and hence, cause dangerous injuries and damage to persons who used the Pelvic Mesh Products.

59.  Defendants' concealment and omissions of material fact concerning the safety of the Pelvic Mesh Products were made to cause the Plaintiff, the Plaintiff's physicians and healthcare providers to purchase, prescribe, and/or dispense the Pelvic Mesh Products; and/or to mislead them into reliance and cause  to have the Pelvic Mesh Products implanted into the body of patients.

60.  At the time these representations were made by Defendants, and at the time Plaintiff used the Pelvic Mesh Products, Plaintiff was unaware of the falsehood of these representations, and reasonably believed them to be true.

61.  Defendants knew and had reason to know that the Pelvic Mesh Products could and would cause severe and grievous personal injury to the users of the Pelvic Mesh

Products, and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

62.     In reliance upon these false representations, Plaintiff was induced to, and did use the Pelvic Mesh Products, thereby sustaining severe and permanent personal injuries and damages. Defendants knew or had reason to know that Plaintiff and Plaintiff's physicians and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of the Pelvic Mesh Products, as described in detail herein.

63.     As a result of Defendants' limited research and testing, Defendants distributed false information, including but not limited to assuring, the public, and Plaintiff's healthcare providers and physicians, that the Pelvic Mesh Products were safe for use as a means of providing relief from stress urinary incontinence and/or prolapse and were as safe or safer than other products and/or procedures available and on the market. Further, Defendants misrepresented to the Plaintiff and to the Plaintiff's physicians that the Pelvic Mesh Products were more effective than other means of treatment for these conditions for which they were implanted.  As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

64.     Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

65.     The information distributed to the public, the medical community, the FDA, and Plaintiff by Defendants included, but was not limited to, reports, press releases, advertising

campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth about the dangers of the use of the Pelvic Mesh Products.

66.    Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Pelvic Mesh Products specifically, that the Pelvic Mesh Products did not have dangerous and/or serious adverse health safety concerns, and that the Pelvic Mesh Products were as safe as other means of treating vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse or rectocele.

67.    Defendants intentionally failed to inform the public, including Plaintiff, of the high failure rate including erosion, the difficulty of removing the mesh, and the risk of permanent injury.

68.    Defendants chose to over-promote the safety, efficacy and benefits of the Pelvic Mesh Products instead.

69.    Defendants' intent and purpose in making these misrepresentations was to deceive the public, the medical community, and Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure them of the quality and fitness for use of the Pelvic Mesh Products; and induce Plaintiff, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Pelvic Mesh Products.

70.    Defendants made claims and representations in its documents submitted to the FDA and its reports to the public and to healthcare professionals and in advertisements that the Pelvic Mesh Products did not present serious health risks.

71.    Upon information and belief, Defendants made claims and representations in its documents submitted to the FDA and its reports to the public and to healthcare

24

professionals and in advertisements that the Pelvic Mesh Products did not present serious health risks.

72.     These representations, and others made by Defendants, were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

73.     These representations, and others made by Defendants, were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals and other members of the healthcare community, and were made in order to induce Plaintiff, and Plaintiff's healthcare professionals, to rely on misrepresentations, and caused Plaintiff to purchase, rely, use, and request the Pelvic Mesh Products, and caused her healthcare professionals to dispense, recommend, or prescribe the Pelvic Mesh Products.

74.     Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Pelvic Mesh Products to the public at large, for the purpose of influencing the sales of Pelvic Mesh Products known to be dangerous and defective, and/or not as safe as other alternatives. Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Pelvic Mesh Products.

75.     At the time the representations were made, Plaintiff and Plaintiff's healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Pelvic Mesh Products, did not discover the true facts about the dangers and serious health and/or safety risks, nor did they discover the false representations of Defendants, nor would they with reasonable diligence have discovered the true facts or Defendants' misrepresentations.

25

76.     Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Pelvic Mesh Products, or in the case of the Prolift System, that the Defendants had not sought nor obtained FDA clearance for the product, Plaintiff would not have purchased, used, or relied on Defendants' Pelvic Mesh Products.

77.     At all times relevant herein, the Pelvic Mesh Products were widely advertised and promoted by the Defendants as a safe and effective treatment for vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse or rectocele. Defendants minimized the risks posed to rectocele and vaginal prolapse patients with implantation of the Pelvic Mesh Products.

78.     At all times relevant to this action, Defendants knew that the Pelvic Mesh Products were not safe for the patients for whom they were prescribed and implanted, because the mesh eroded and otherwise malfunctioned, and therefore failed to operate in a safe and continuous manner, causing injuries including, but not limited to, erosion, extrusion, infection, sepsis, chronic foreign body invasion, dense adhesions and worsening dyspareunia. Removal of eroded or infected mesh brings a high rate of life-threatening complications including permanent disfigurement and hemorrhage. Removal can require multiple surgical interventions in the operating theater for complete removal and results in scarring on fragile compromised pelvic tissue and muscles.

79.     Defendants failed to design and establish a safe, effective procedure for removal of the Products, or to determine if a safe, effective procedure for removal of the Products exists.

80.     At all relevant times herein, Defendants continued to promote Pelvic Mesh Products as safe and effective even when no clinical trials had been done supporting long or short term safety and efficacy.

81.     In doing so the Defendants concealed the known risks and failed to warn of known or scientifically knowable dangers and risks associated with the Pelvic Mesh Products for treatment of vaginal vault prolapse, stress urinary incontinence, pelvic organ prolapse or rectocele.

82.     At all relevant times herein, Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff and the general public on notice of the dangers and adverse effects caused by implantation of the Pelvic Mesh Products system including, but not limited to, mesh erosion, dense adhesions, worsening dyspareunia, chronic pain, infection, sepsis, permanent disfigurement and multiple surgeries for mesh removal.

83.     The Pelvic Mesh Products as designed, manufactured, distributed sold and/or supplied by Defendants were defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of Defendants' knowledge of lack of pelvic health safety.

84.     At all times herein mentioned, the employees, agents, officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned Pelvic Mesh Products when they knew of the hazards and dangerous propensities of said Pelvic Mesh Products, and thereby actively participated in the tortuous conduct that resulted in the injuries suffered by Plaintiff.

## V.  CAUSES OF ACTION

## COUNT I: NEGLIGENCE

27

85.     Paragraphs 1-84 of the Complaint are hereby incorporated by reference as if fully set forth herein.

86.     Defendants had a duty to individuals, including Plaintiff, to exercise reasonable and ordinary care in the manufacture, design, labeling, packaging, testing, instruction, warning, selling, marketing, distribution, and training related to its Pelvic Mesh Products.

87.     Defendants breached their duty of care and were negligent as described herein in the design, manufacture, labeling, warning, instruction, training, selling, marketing, and distribution of the Pelvic Mesh Products in one or more of the following respects:

a.     Failing to design the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

b.     Failing to manufacture the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

c.     Failing to use reasonable care in the testing of the Products so as to avoid an unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

d.     Failing to use reasonable care in inspecting the Products so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

e.     Failing to use reasonable care in training its employees and health care providers related to the use of the Products so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

28

f.    Failing to use reasonable care in instructing and/or warning health care providers, the FDA and the public as set forth herein of risks associated with the Products, so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

g.    Failing to use reasonable care in marketing and promoting the Products, so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff;

h.    In negligently and carelessly promoting the use of the Pelvic Mesh Products to physicians who had not received sufficient training to master the techniques necessary for implantation of the device into the Plaintiff;

I.    Otherwise negligently or carelessly designing, manufacturing, marketing, distributing, warning, labeling studying, testing or selling the Pelvic Mesh Products;

j.    Failed to establish the safety of a medical device, like the Products, before selling it;

k.    In the case of the Prolift System, failing to use reasonable care in seeking and obtaining FDA clearance prior to marketing and selling the device for implantation into the human body;

l.    Negligently marketed a device (including the Products) to fix a medical problem that made many patients worse; and

m.    Failed to know how to safely remove a device, like the Products, if something went wrong, such as unacceptable complications like erosion and pain with sex.

29

88.     Failed to conduct post-market vigilance, or surveillance, by:

a.      Monitoring or acting on findings in the scientific and medical literature; and

b.      Monitoring or investigating and evaluating reports in the FDA adverse event databases for their potential significance for defendants' Pelvic Mesh Products.

89.      Failed to comply with manufacturer requirements of the Medical Device Reporting (MDR) Regulations, specifically:

a.      Failed to report MDRs (Medical Device [adverse event] Reports); and

b.      Failed to investigate reports of serious adverse events.

90.     As a direct and proximate result of Defendants' negligence, Plaintiff has been catastrophically injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, other damages, and/or death.

WHEREFORE,  Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages and punitive damages in an amount in excess of $75,000.00 and together with interests, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT II

## STRICT LIABILITY – FAILURE TO WARN

91.     Paragraphs 1-90 of the Complaint are hereby incorporated by reference as if fully set forth herein.

30

92.     The Defendants failed to properly and adequately warn and instruct the Plaintiff and the health care providers as to the proper candidates, and the safest and most effective methods of implantation, in connection with the use of Defendants' Pelvic Mesh Products.

93.     The Defendants failed to properly and adequately warn and instruct the Plaintiff and their health care providers as to the risks and benefits of the Defendants' Pelvic Mesh Products, given the Plaintiff's conditions and need for information.

94.     The Defendants failed to properly and adequately warn and instruct the Plaintiff and the health care providers with regard to the inadequate research and testing of the Pelvic Mesh Products, and the complete lack of a safe, effective procedure for removal of the Pelvic Mesh Products.

95.     In addition, the Pelvic Mesh Products were defective due to the lack of necessary and appropriate warnings regarding, but not limited to, the following:

a.     the Products' propensities to contract, retract, and/or shrink inside the body;

b.     the Products' propensities for degradation, fragmentation, disintegration and/or creep;

c.     the Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.     the rate and manner of mesh erosion or extrusion;

e.     the risk of chronic inflammation resulting from the Products;

f.     the risk of chronic infections resulting from the Products;

g.     the risk of permanent vaginal or pelvic scarring as a result of the Products;

h.      the risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

I.      the need for corrective or revision surgery to adjust or remove the Products;

j.      the severity of complications that could arise as a result of implantation of the Products;

k.      the hazards associated with the Products;

l.      the Products' defects described herein;

m.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products is no more effective than feasible available alternatives;

n.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products exposes patients to greater risk than feasible available alternatives;

o.      treatment of pelvic organ prolapse and stress urinary incontinence with the Products makes future surgical repair more difficult than feasible available alternatives;

p.      use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.      removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.      complete removal of the Products may not be possible and may not result in complete resolution of the complications, including pain.

s.  Failed to establish the safety of a medical device, like the Products, before selling it;

t.  Negligently marketed a device (including the Products) to fix a medical problem that made many patients worse; and

u.  Failed to know how to safely remove a device, like the Products, if something went wrong, such as unacceptable complications like erosion and pain with sex.

96.  The Defendants intentionally, recklessly, and maliciously misrepresented the safety, risks, and benefits of the Defendants' Pelvic Mesh Products, understating the risks and exaggerating the benefits in order to advance their own financial interests, with wanton and willful disregard for the rights and health of the Plaintiff.

97.  As a direct and proximate result of the Pelvic Mesh Products' aforementioned defects, Plaintiff has been catastrophically injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic loss and damages including, but not limited to medical expenses, lost income, other damages, and/or death.

98.  The Defendants are strictly liable in tort for their wrongful conduct.

WHEREFORE,  Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages and punitive damages in an amount in excess of $75,000.00 and together with interests, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT III

## STRICT LIABILITY – DESIGN DEFECT

33

99.     Plaintiff incorporates by reference paragraphs 1-98 of this Complaint as if fully set forth herein.

100.     The Pelvic Mesh Product implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein with respect to its design.   As previously stated, the Products' design defects include, but are not limited to:

a.      the use of polypropylene material and/or collagen material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b.      the design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c.      biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d.      the use and design of arms and anchors in the Products, which, when placed in the women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

e.      the propensity of the Products for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f.      the inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and

causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

g. the propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h. the propensity of the Products for particle loss or "shedding", which causes a chronic inflammatory response and fibrotic reaction, and results in continuing injury over time; the lack of porosity of the Products, which leads to fibrotic bridging and results in continuing injury over time;

i. the creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions;

j. Failed to establish the safety of a medical device, like the Products, before selling it;

k. Negligently marketed a device (including the Products) to fix a medical problem that made many patients worse; and

l. Failed to know how to safely remove a device, like the Products, if something went wrong, such as unacceptable complications like erosion and pain with sex.

101.    As a direct and proximate result of the Product's aforementioned defects as described herein, Plaintiff experienced significant mental and physical pain and suffering, have sustained permanent injury, has undergone medical treatment and will likely undergo future

medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income and other damages.

102.    Defendants are strictly liable to Plaintiff for designing a defective product.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages, in an amount in excess of $75,000.00 and together with interests, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT IV

## PUNITIVE DAMAGES

103.    Plaintiff incorporates by reference paragraphs 1-102 of this Complaint as if fully set forth herein.

104.    Defendants sold their Products to Plaintiff's healthcare providers and other healthcare providers throughout the United States without doing adequate testing to ensure that the Products were reasonably safe for implantation in the female pelvic area.

105.    Defendants sold the Products to Plaintiff's health care providers and other health care providers throughout the United States in spite of their knowledge that their Products can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by the Plaintiff.

106.    At all times relevant hereto, Defendants knew or should have known that the Defendants' Pelvic Mesh Products were inherently dangerous with respect to the risks of erosion, failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in

36

an effort to cure the conditions proximately related to the use of the product, as well as other severe and personal injuries which are permanent and lasting in nature.

107.    At all times material hereto, Defendants attempted to misrepresent and did misrepresent facts concerning the safety of the Defendants' Pelvic Mesh Products.

108.    Defendants' misrepresentations included knowingly withholding material information from the medical community and the public, including Plaintiff, concerning the safety and efficacy of the Defendants' Pelvic Mesh Products.

109.    At all times material hereto, Defendants intentionally, fraudulently, maliciously and/or recklessly disregarded the fact that the Defendants' Pelvic Mesh Products cause debilitating and potentially lethal side effects with greater frequency than safer alternative methods products and/or procedures and/or treatment.

110.    At all times material hereto, Defendants intentionally, fraudulently, maliciously and/or recklessly disregarded the fact that the Defendants' Pelvic Mesh Products cause debilitating and potentially lethal side effects with greater frequency than safer alternative products and/or methods of treatment and recklessly failed to advise healthcare providers, the public and the FDA of same.

111.    At all times material hereto, Defendants intentionally misstated and misrepresented data and continue to misrepresent data so as to minimize the true and accurate risk of injuries and complications caused by the Defendants' Pelvic Mesh Products.

112.    Notwithstanding the foregoing, Defendants continue to aggressively market the Defendants' Pelvic Mesh Products to consumers, without disclosing the true risk of side effects and complications.

113.    Defendants knew of the Defendants' Pelvic Mesh Products defective and unreasonably dangerous nature, but continued to manufacture, produce, assemble, market, distribute, and sell the Defendants' Pelvic Mesh Products so as to maximize sales and profits at the expense of the health and safety of the Public, including Plaintiff, in conscious and/or reckless disregard of the foreseeable harm caused by the Defendants' Pelvic Mesh Products.

114.    Defendants continue to intentionally, fraudulently, maliciously and with reckless disregard failed to disclose to the public, including Plaintiff, the serious side effects of the Defendants' Pelvic Mesh Products in order to ensure continued and increased sales.

115.    Defendants' fraudulently, maliciously and with reckless disregard failed to disclose information that deprived Plaintiff of necessary information to enable her to weigh the true risks of using the Defendants' Pelvic Mesh Products against their benefits.

116.    As a direct and proximate result of the foregoing acts and omissions, Plaintiff has required and will require health care and services, and has incurred medical, health care, incidental, and related expenses. Plaintiff is informed and believes and further alleges that will in the future be required to obtain further medical care and/or hospital care and medical services.

117.    Defendants have engaged in conduct entitling Plaintiff to an award of punitive damages.

118.    Defendants' conduct as described herein shows intentional, fraudulent, malicious, and reckless conduct that justifies an award of punitive damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests punitive damages in an amount

in excess of $75,000.00, together with interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT V

## DISCOVERY RULE AND TOLLING

119.   Plaintiff incorporates by reference paragraphs 1-118 of this Complaint as if fully set forth herein.

120.   Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

121.   Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

122.   Despite diligent investigation by Plaintiff into the cause of her injuries, including consultations with Plaintiff's medical providers, the nature of Plaintiff's injuries and damages, and their relationship to the Products was not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's suit was filed well within the applicable statutory limitations period.

123.   The running of the statute of limitations in this cause is tolled due to equitable tolling.  Defendant(s) are estopped from asserting a statute of limitations defense due

to Defendants' fraudulent concealment, through affirmative misrepresentations and omissions, from Plaintiff and Plaintiff's physicians of the true risks associated with the Products. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendant(s).

124. The following are examples of how Defendants suppressed, concealed, omitted and/or misrepresented information to , the medical community, to regulatory bodies, and/or the general public:

a. A study published in *Obstetrics & Gynecology* in 2010, and authored by Iglesia et al., had to be halted early due to a predetermined stopping criteria for vaginal mesh erosion at a median follow-up of 9.7 month (range, 2.4-26.7 months). The study found an erosion rate of 15.6% with no difference in overall objective and subjective cure rates. However, instead of using the findings of this study to warn surgeons about the potentially higher rate of complications associated with its mesh devices, Defendants undertook instead to undermine and refute the findings in order to avoid negatively impacting its ability to market its products.

b. Defendants made claims in its IFUs and other marketing materials that its mesh had bidirectional elasticity when, in fact, Defendants were instructed by the FDA to remove this statement from its marketing materials due to the lack of sufficient evidence to support the statement.

40

c.     Defendants made claims in its IFUs and other marketing materials that its mesh does not degrade and is inert. When asked by the United Kingdom regulatory agency, MHRA, about whether or not its mesh degrades, Defendants stated that "there have been no observations of fiber degradation in complaints received and/or products returned" when they knew that there had been four reports of degradation or absorption. Even the manufacturer of the polypropylene used by Ethicon in its meshes suggested in its MSDS that its polypropylene must not be used for permanent implantation in the human body based in part on the fact that oxidizers and peroxides, both of which are created by the human body in response to any kind of inflammatory reaction, can degrade polypropylene.

d.     Defendants made claims in its IFUs and other marketing materials that its mesh has been proven safe and effective, despite the fact that there was almost no data to support the TVT's use in pelvic surgery prior to its being launched. Since the launch of TVT, Ethicon has relied primarily on its own studies while ignoring studies that question the safety and efficacy of its products. Good evidence that Ethicon is cherry-picking the results of specific studies is demonstrated by its failure to cite to studies in its IFUs and other marketing materials that are critical of their products. (ex: Richter et al., *Retropubic versus Transobturator Midurethral Slings for Stress Incontinence*, New England Journal of Medicine, 362;22; Anger et al., Complications of sling surgery among female Medicare beneficiaries,

Obstet Gynecol, 2007 Mar; 109(3)707-14; Novara et al., *Critical Assessment of Pelvic Floor Surgical Reconstruction, European Association of Urology*, 4(2006) 202-213; and Sung et al., *Comparison of Retropubic versus Transobturator Approach to Midurethral slings: A Systematic Review and Meta-Analysis*, Am J Obstet Gyncol. 2007 July; 197(1):3-11.)

e.     Defendants made claims in its IFUs and other marketing materials that "Animal studies show that implantation of Gynecare Gynemesh PS mesh elicits a minimum to slight inflammatory reaction which is transient..." when Ethicon knew that the foreign body reaction and inflammatory response to its mesh would transition into a more chronic phase that stays for the duration of the life of the patient.

f.     Defendants made claims in their Patient Brochures and other marketing materials that "transient leg pain lasting 24 to 48 hours may occur and can usually be managed with mild analgesics" even though they knew that persistent leg pain was a known complication that could be severe and lifelong.


WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages and punitive damages in an amount in excess of $75,000.00 and together with interests, costs of suit, attorneys' fees, punitive damages, and such further relief as the Court deems equitable and just.

## COUNT VI

## NEGLIGENT TRAINING

125.    Plaintiff incorporates by reference paragraphs 1-124 of this Complaint as if fully set forth herein.

126.    Defendants voluntarily assumed duties to train physicians, including Plaintiff's physicians, to use the Pelvic Mesh Products to perform medical procedures for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence.

127.    By assuming this duty, Defendants had an obligation to the Plaintiff, as purchasers and end-users of the Pelvic Mesh Products, to ensure that Plaintiff's physicians were adequately trained, educated and/or instructed to determine the appropriateness and efficacy of the Products implanted in  during their medical care and treatment.

128.    The Defendants breached these duties by and through their agents, servants and/or employees, acting within the course and scope of their employment, by doing or failing to do one or more of the following:

a.    Generally failing to use reasonably care in training, educating and/or instructing physicians interested in performing procedures for the treatment of medical conditions in the female pelvis, primarily pelvic organ prolapse and stress urinary incontinence, as to the appropriateness for such a procedure;

b.    Generally failing to use reasonably care in training, educating and/or instructing physicians as to the risks associated with the Products, so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including ;

c.  Generally failing to use reasonably care in training, educating and/or instructing physicians regarding the proper techniques necessary for implantation of the Products into the pelvic region;

d.  Specifically implementing a training program which is defective, inadequate and deficient in that it fails to adequately and reasonably train, educate and/or instruct physicians as to which patients are appropriate candidates for the Pelvic Mesh Products and which are not;

e.  Specifically failing to use reasonable care in training, educating and/or instructing physicians that the Pelvic Mesh Products had not been adequately tested to establish the safety and efficacy of their pore size;

f.  Specifically failing to use reasonable care in training, educating and/or instructing physicians that the Pelvic Mesh Products had not been found to be safe and effective for the purposes of treating incontinence and/or prolapse;

g.  Specifically failing to use reasonable care in training, educating and/or instructing physicians that Defendants had done no premarket testing regarding the degradation of polypropylene;

h.  Specifically failing to use reasonable care in training, educating and/or instructing physicians that the Pelvic Mesh Products are weakened through heat and stress during the manufacturing process;

44

i.     Specifically failing to use reasonable care in training, educating and/or instructing physicians that Defendants had not conducted adequate testing to determine whether the Pelvic Mesh Products would deform or curl under stress;

j.     Specifically failing to use reasonable care in training, educating and/or instructing physicians regarding the difficulty in removing the Pelvic Mesh Products in the event removal was necessary, or how to try to get the Products out of the body;

k.     Specifically failing to use reasonable care in training, educating and/or instructing physicians regarding the possibility of excessive mesh contraction, retraction, and/or shrinkage inside the body resulting in surrounding nerve damage;

l.     Specifically failing to use reasonable care in training, educating and/or instructing physicians regarding the possibility for Product degradation or fragmentation;

m.    Specifically failing to use reasonable care in training, educating and/or instructing physicians regarding the possibility that the Product could "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

n.     Specifically failing to use reasonable care in training, educating and/or instructing physicians regarding the inelasticity of the Products, causing the Products to be improperly matted to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking); and

o.     Specifically failing to use reasonable care in training, educating and/or instructing physicians regarding the possibility of permanent vaginal or rectal nerve damage.

129.     At the time the Pelvic Mesh Products were sold to consumers, including to Plaintiff, Defendants had actual or constructive knowledge that the training, education and/or instruction provided to physicians, including Plaintiff's physicians, was woefully incomplete and inadequate.

130.     As a direct and proximate result of Defendants' negligence, Plaintiff has been catastrophically injured, sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium and economic loss and damages including, but not limited to medical expenses, lost income and damages.

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly, severally and in the alternative, and requests compensatory damages, punitive damages in an amount of $75,000.00 and together with interests, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

**VII. PRAYER FOR RELIEF**

46

WHEREFORE, Plaintiff demands judgment against Defendants, and each of them, individually, jointly and severally and requests compensatory and punitive damages in an amount in excess of $75,000.00 and together with interests, cost of suit, attorneys' fees, and all such other relief as the Court deems just and proper as well as:

1. Compensatory damages to Plaintiff for past, present, and future damages, including, but not limited to, pain and suffering for severe and permanent personal injuries sustained by , health and medical care costs, together with interest and costs as provided by law;

2. Restitution and disgorgement of profits;

3. Reasonable attorneys' fees;

4. The costs of these proceedings;

5. All ascertainable economic damages;

6. Punitive damages; and

7. Such other and further relief as this Court deems just and proper).

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury as to all issues.

Dated: September 27, 2018

Respectfully submitted,

<u>/s/Thomas O. Plouff</u>

Thomas O. Plouff

Costello, McMahon, Burke & Murphy, Ltd.

150 North Wacker Drive, Suite 3050

Chicago, IL 60606

P: (312)541-9700

F: (312)541-0520

***Counsel for Plaintiff***

47

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2018, I electronically filed the forgoing with the Clerk of

Court using CM/ECF system which will send notification of such filing to the CM/ECF

participants registered to receive service in this member case.