IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA A. STARK, **Plaintiff,** v. JOHNSON & JOHNSON and ETHICON, INC., **Defendants**. | Case No. 18 cv 06609 Judge Mary M. Rowland |

### MEMORANDUM OPINION & ORDER

Plaintiff Patricia Stark brought suit alleging several products liability claims for two pelvic mesh products, a TVT-O mesh sling and TVT mesh sling. In the course of summary judgment briefing, Plaintiff dropped all claims regarding the TVT mesh sling, and conceded several claims regarding the TVT-O mesh sling. Defendants Johnson & Johnson and Ethicon, Inc. move for summary judgment on the remaining failure to warn, design defect, and negligent misrepresentation claims. For the reasons stated below, Defendants' motion for summary judgment (Dkt. 58) is granted.

### BACKGROUND

**1. Local Rule 56.1 Issues**

As a preliminary matter, neither Defendants nor Plaintiff included a statement of facts section in their memoranda of law in support of the summary judgment motion or in opposition thereto, electing instead to leave it to the Court to sift through the Parties' Local Rule 56.1 statements, and the underlying exhibits, to

1

determine the factual background and sequence of relevant events. Courts in this district have repeatedly informed litigants that a Local Rule 56.1 statement of facts is not a substitute for a statement of facts contained in a supporting memorandum of law. *See e.g., FirstMerit Bank, N.A. v. 2000 N. Ashland, LLC*, No. 12 C 572, 2014 U.S. Dist. LEXIS 159741, at *11 (N.D. Ill. 2014); *Condon v. City of Chicago*, No. 9 C 2641, 2011 U.S. Dist. LEXIS 131931, at *1 n.1 (N.D. Ill. 2011); *Cleveland v. Prairie State College*, 208 F. Supp. 2d 967, 972-73 (N.D. Ill. 2002); *Duchossois Industries, Inc. v. Crawford & Co.,* 99 C 3766, 2001 U.S. Dist. LEXIS 444, at *1 (N.D. Ill. 2001) ("The purpose of LR 56.1 statements [is] not intended to be substitutes for a statement of facts section of a memorandum of law. Rather, their purpose is to assist the court in identifying those material, uncontested facts in the record that entitle the movant to judgment."). The Parties' failure to include a statement of fact section causes an undue burden on the Court to sift through mounds of paper to ferret out the material facts at issue. This practice also "allows the parties to circumvent the 15-page limit on briefs imposed by Local Rule 7.1." *Condon*, 2011 U.S. Dist. LEXIS 131931, at *1 n.1.

Additionally, Courts in this district have repeatedly held that, in the memorandum of law filed in support of the summary judgment motion or in opposition thereto, parties should cite to specific Local Rule 56.1 statements of fact in support of their arguments, not to the record directly. *See e.g., FirstMerit Bank, N.A.*, 2014 U.S. Dist. LEXIS 159741, at *11 (N.D. Ill. 2014); *Morningware, Inc. v. Hearthware Home Products Inc.*, No. 9 C 4348, 2012 U.S. Dist. LEXIS 121333, at *3

(N.D. Ill. 2012); *LaSalvia v. City of Evanston*, 806 F. Supp. 2d 1043, 1046 (N.D. Ill. 2011). Both parties fail to cite to their Local Rule 56.1 Statement and instead cite directly to the record, including several depositions. (*see e.g.,* Dkt. 60, 4; Dkt. 67, 5). It is not the role of the Court to parse out the parties' exhibits to construct undisputed facts. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (Judges are not "like pigs, hunting for truffles buried in briefs"). It is not the Court's job to sift through the record to determine whether there is sufficient undisputed evidence to support a party's claim or defense as a matter of law. *Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006). Rather, it is "[a]n advocate's job… to make it easy for the Court to rule in his client's favor." *Dal Pozzo v. Basic Machinery Co., Inc.*, 463 F.3d 609, 613 (7th Cir. 2006).

**2. Material Facts**

The undisputed material facts relevant to this motion are as follows.[1] Plaintiff Patricia Stark suffered from "stress urinary incontinence" and underwent surgery with Ethicon's TVT-O medical device. (Dkt. 59 ¶ 6). Dr. Roth implanted the device on February 15, 2007. (*Id.*). Prior to surgery, Dr. Roth offered Stark several non-surgical options, but Stark chose to have the surgery for a "more permanent fix." (*Id.* at ¶ 7). Dr. Roth chose the TVT-O because he believed it was a good option for Stark and the potential benefits outweighed the risks. (*Id.* at ¶ 8). Dr. Roth informed Stark that she might have some trouble healing from the procedure as a result of her

---

[1] Indeed, Plaintiff admits every factual paragraph in response to Defendants' Local Rule 56.1 Statement of Material Facts. (Dkt. 68 ¶¶ 1-47).

Ehlers-Danlos Syndrome, a connective tissue disorder resulting in weakened tissues. (Dkt. 68 ¶ 49).[2]

After the February 2007 surgery, Stark had "a general feeling that [the TVT-O surgery] didn't work." (Dkt. 59 ¶ 11). Dr. Roth referred Stark to Dr. Elser, a urogynecologist, based on Stark's continued complaints of incontinence and pelvic pain. (*Id*. at ¶ 12). Stark met with Dr. Elser for the first time on March 5, 2008. (*Id*. at ¶ 13). Stark reported that she had a "failed bladder lift,"[3] and was still suffering from incontinence and chronic pain. (*Id*. at ¶¶ 14-16). After urodynamic testing, Dr. Elser told Stark that the TVT-O mesh had shifted and moved, and suggested surgical treatment with a TVT sling. (*Id*. at ¶¶ 17-19). Dr. Elser discussed the risk factors with Stark, including the need to re-operate for sling erosion or exposure. (*Id*. at ¶ 20).[4]

Dr. Elser performed surgery using Ethicon's TVT sling on May 21, 2008. (Dkt. 59 ¶ 25). During the surgery, Dr. Elser observed "a portion of the sling embedded in the urethral wall that appeared to be from the prior surgery." (*Id*. at ¶ 26). Dr. Elser removed the portion of the mesh that was in the urethra and repaired the urethra; she could not, however, remove all of the mesh. (*Id*. at ¶¶ 27-28). Right after the surgery, Dr. Elser told Stark that the TVT-O eroded into her urethra after the 2008 surgery. (*Id*. at ¶ 29). Dr. Elser also discussed the eroded mesh at several follow-up

---

[2] Dr Roth also testified that he "most likely" told Stark that her mesh complications were due to her Ehlers-Danlos. (Dkt. 68 ¶ 49).
[3] By "failed bladder lift," Stark meant the February 15, 2007 surgery by Dr. Roth. (Dkt. 59 ¶ 15).
[4] Stark signed a consent form that warned: "When mesh material is used during reconstructive pelvic surgery, there is potential risk of mesh erosion or exposure requiring surgical revision or removal." (Dkt. 59 ¶ 21).

4

office visits. (*Id.*). At an appointment with Dr. Elser on February 10, 2010, Stark complained of continued urinary incontinence and pelvic pain. (*Id.* at ¶ 34). Dr. Elser again discussed with Stark the possibility of "recurrent erosion into the urethra." (*Id.*). From her last visit with Dr. Elser on March 11, 2010, until seeing a new physician in August 2015, Stark testified that her "incontinence was worse than before I had the first surgery, and I felt like everything got worse: pain, the flow, the spasms, the leakage, the smell, waking up at night." (*Id.* at ¶ 35).

On August 19, 2015, Stark saw Dr. Valaitis with complaints of urinary incontinence. (Dkt. 59 ¶ 36). Dr. Valaitis assessed Stark to have overactive bladder, recurrent stress incontinence, and voiding difficulty that could suggest recurrent mesh erosion into the urethra. (*Id.* at ¶ 37). On October 1, 2015, Dr. Valaitis performed a cystoscopy in conjunction with a bulking procedure to treat Stark's stress urinary incontinence. (*Id.* at ¶ 39). During the procedure, Dr. Valaitis saw strands of mesh in Stark's urethra. (*Id.* at ¶ 40). On October 16, 2015, Dr. Valaitis and Stark decided Stark would undergo an outpatient removal of the eroded mesh. (*Id.* at ¶ 41). The procedure occurred on November 13, 2015. (*Id.* at ¶ 44). During the procedure, Dr. Valaitis attempted to remove the mesh but was unable to do so. (*Id.* at ¶ 45).

In March 2018, Stark had a discussion with a friend about her injuries from the eroded mesh. (Dkt. 68 ¶ 52). Her friend suggested she see an attorney who specialized in mesh litigation. (*Id.*). In June of 2018, Stark retained an attorney. (*Id.*). She filed this lawsuit on September 27, 2018. (Dkt. 1).

Plaintiff claims that she had no reason to investigate whether the mesh was defective before the March 2018 conversation with her friend. Stark states that she "was led to believe" by Dr. Elser and Dr. Valaitis that her complications arose because of "her body's response to the mesh." (Dkt. 68 ¶¶ 50-51). She testified that she simply thought "it didn't work; I thought it was me." (*Id.* at ¶ 55).[5] All three doctors noted that Stark's Ehlers-Danlos Syndrome could have contributed to her complications and the mesh erosion. (*Id.* at ¶¶ 49-51). However, when questioned at her deposition about whether any of the doctors "told you that Ehlers-Danlos was responsible for you having these issues," Stark responded, "I don't think so." (Dkt. 68, Ex. A, 228:7-9).

## LEGAL STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine factual dispute exists when there is enough evidence that a reasonable jury could find in favor of the nonmoving party. *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 661 (7th Cir. 2016); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In construing the evidence and facts supported by the record in favor of the non-moving party, the Court gives the non-moving party "the benefit of

---

[5] Plaintiff's expert, Dr. Jerry Blaivas, stated that patients often do not realize that the complications they are experiencing are a result of the mesh, and instead think "it's how their body reacts to the implant surgery." (Dkt. 68 ¶ 56).

6

reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted).

To survive a motion for summary judgment, the plaintiff need not prove his case; "he need only show that there is a genuine issue of material fact as to each element." *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004) Summary judgment is proper, however, against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 323; *see also White*, 829 F.3d at 841 (summary judgment warranted where a reasonable juror could not find in favor of the non-moving party "on the evidence submitted in support of and opposition to the motion for summary judgment") (internal citation omitted).

## **DISCUSSION**

The parties agree Illinois law governs their dispute. (Dkt. 60, 2; Dkt. 67, 3). They also agree that the statute of limitations applicable to Stark's claims is two years. 735 Ill. Comp. Stat. 5/13-202. Although the parties do not, for the most part, disagree about the events that occurred, they do dispute which of those events triggered the statute of limitations. Stark argues that her claim is not time-barred because the Illinois discovery rule tolled the statute of limitations. Under Illinois law, whether an action was brought within the time allowed by the discovery rule is usually a question of fact. *See Clay v. Kuhl*, 189 Ill.2d 603 (2000). The issue may be determined as a matter of law, however, when the answer is clear from the record. *See Id*.

7

In Illinois "[t]he general rule is that the limitations period begins to run 'when facts exist which authorize the bringing of an action.'" *Orso v. Bayer Corp*, No. 04 C 0114, 2009 WL 249235, at *2 (N.D. Ill. Feb. 2, 2009) (citing *MC Baldwin Fin. Co. v, DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6 (Ill.App.Ct. 2006)).[6] However, Illinois also recognizes the "discovery rule," which serves to "postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should have known that he has been injured and that his injury was wrongfully caused." *Golla v. Gen. Motors Corp.*, 167 Ill.2d 353, 361 (1995); *see also Orso*, 2009 WL 249235, at *3 (holding that once a plaintiff reasonably should have known this, "the party is under an obligation to inquire further to determine whether an actionable wrong was committed."); *Curtis v. Mentor Worldwide, LLC*, 543 Fed.App'x. 901, 903 (11th Cir. 2013) (applying the Illinois discovery rule to a pelvic mesh case). "The phrase 'wrongfully caused' does not mean knowledge of a specific defendant's negligent conduct or knowledge of the existence of a cause of cation." *Castello v. Kalis*, 352 Ill.App.3d 736, 744 (1st Dist. 2004) (quoting *Young v. McKiegue*, 303 Ill.App.3d 380 (1999)). Instead, it refers to when an "injured party 'becomes possessed of sufficient information concerning his injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved.'" *Castello*, 352 Ill.App.3d at 744 (quoting *Knox College v. Celotex Corp.*, 88 Ill.2d 407, 415 (1981)). At that point, "the burden is upon the plaintiff to inquire further as to the existence of a cause of action." *Freire v. American Medical Sys., Inc.*, No. 2:13 C 9079,

---

[6] Thus, "a cause of action accrues when all the elements of a cause of action are present." *MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 364 Ill.App.3d 6 (Ill.App.Ct. 2006).

8

2019 WL 1575187, at *3 (S.D. W. Va. Apr. 11, 2019) (citing *Hoffman v. Orthopedic Sys., Inc.*, 765 Ill.App.3d 1004, 1010 (Ill.App.Ct. 2002)).

Stark contends that she could not have reasonably known that the TVT-O mesh was defective until she spoke with her friend in 2018. The Court disagrees. Contrary to Stark's assertions, her claim began to accrue when Stark knew or should have known that she was injured and that her injury was wrongfully caused—not when she became aware of her right to sue. *Freire*, 2019 WL 1575187, at *3 (applying Illinois law and holding the same); *see also Hoffman* 765 Ill.App.3d at 122. The record indicates that Stark was aware of her injury shortly after the February 2007 surgery, when she had "a general feeling that [the TVT-O surgery] didn't work," and reported her "failed bladder lift" to Dr. Elser. (Dkt. 59 ¶¶ 11, 14-15). Stark was also aware of the injuries from the eroded mesh immediately after the May 2008 surgery, when Dr. Elser informed Stark of the eroded mesh in the urethra and that Dr. Elser could not remove all of the mesh. (*Id.* at ¶¶ 26-29). At an office visit in February 2010, Dr. Elser again discussed with Stark the possibility of erosion into the urethra. (*Id.* at ¶ 34). Stark testified that between March 2010 and August 2015, her incontinence and pain were worse than before her first surgery in 2008. (*Id.* at ¶ 35). Finally, Stark was aware of continued complications from the eroded mesh in October and November of 2015. During the cystoscopy on October 1, 2015, Dr. Valaitis saw strands of mesh in the urethra, and Dr. Valaitis informed Stark of the eroded mesh. (*Id.* at ¶¶ 40-41). They both agreed that Stark would undergo an outpatient removal of the eroded mesh

9

in November 2015. (*Id*.). Immediately after that procedure, Stark knew that Dr. Valaitis could not remove the eroded mesh. (*Id*. at ¶ 45).

These undisputed facts indicate that Stark knew the continued pain and incontinence were directly related to the eroded mesh. Arguably, Stark knew or should have known that her injury was wrongfully caused shortly after the 2007 surgery when she continued to experience pain and incontinence, and certainly after the 2008 surgery when Dr. Elser found eroded mesh in the urethra. At the latest, Stark knew after her procedure with Dr. Valaitis in November 2015—which was the second time a physician attempted to remove the eroded mesh—that her injuries were wrongfully caused. At that point, the burden was on Stark to "inquire further as to the existence of a cause of action." *Freire,* 2019 WL 1575187, at *3; *Orso*, 2009 WL 249235, at *6-7 (holding that the statute of limitations began to run after the plaintiff had symptoms from using the product and was told by a physician that there were potential problems resulting from her use of the product). After her two surgeries to remove the eroded mesh, Stark was "obligated to begin her inquiry as to who manufactured her sling and whether her complications were due to a problem with the surgery or a defective sling." *Curtis*, 543 Fed. App'x at 904 (citing *Nolan v. Johns-Manville Asbestos*, 85 Ill.2d 161 (1981)). Even taking the latest date possible of November 2015, Stark's claims expired in November 2017, more than ten months before Stark filed this action in September of 2018. Her claims are thus time-barred.

Relying on caselaw from Arizona, California, and Pennsylvania, Stark argues that she did not know her injury was wrongfully caused because none of the doctors

10

told her that the mesh was defective, and she reasonably believed her complications were the result of her Ehlers-Danlos Syndrome. (Dkt. 67, 6-7). Stark's argument is unpersuasive. First, the record demonstrates that at most, Stark was told her Ehlers-Danlos Syndrome was a contributing factor to the mesh erosion. There is no evidence that any of the doctors conclusively stated that her complications were the result of her Ehlers-Danlos.[7] Despite having been told that her underlying condition may contribute to her complications, Stark still had a duty to investigate whether she had a cause of action and whether her complications were a result of the surgery, a defective product, or something else entirely. *Curtis*, 543 Fed. App'x at 904.

Second, even if Stark's doctors conclusively informed her that her complications arose from her Ehlers-Danlos Syndrome, Stark's claim would still accrue. "Illinois case law suggests that, when a plaintiff has knowledge of an injury, an accurate medical diagnosis is irrelevant to the issue of whether a plaintiff is on notice of its exact wrongful cause." *Orso*, 2009 WL 249235, at *5 (citing, as an example, *Witherell v. Weimer*, 85 Ill.2d 146 (Ill. 1981) (doctor's denial that the birth control pill caused plaintiff's injury did not toll the statute of limitations against the drug manufacturer)); *but cf. Smith v. C. R. Bard, Inc.*, No. 2:16 C 11817, 2018 WL 715448, at * 3 (S.D. W. Va. Feb. 5, 2018) (issue of fact regarding when plaintiff reasonably should have known her mesh injury was wrongfully caused). Illinois courts have

---

[7] Dr. Roth informed Stark that her Ehlers-Danlos could lead to "poor wound healing." (Dkt. 68, Ex. A, 228:10-14). Both Dr. Valaitis and Dr. Elser discussed Ehlers-Danlos with Stark when going over medical history and treatment options, noting it could make Stark more prone to erosion than other patients. (Dkt. 59, Ex. 6, 76:5-24; Dkt. 68, Ex. C, 215:2-16) And as noted above, when asked whether any of the doctors "told you that Ehlers-Danlos was responsible for you having these issues," Stark responded, "I don't think so." (Dkt. 68, Ex. A, 228:7-9).

11

repeatedly held that definitive knowledge of causation is not required because "the term 'wrongfully caused,' does not mean knowledge by a plaintiff of a specific defendant's negligent act or knowledge that an actionable wrong was committed…." *Hoffman*, 327 Ill.App.3d at 1011; *Curtis*, 543 Fed.App'x at 903 ("The Supreme Court of Illinois, however, has rejected the notion that a cause of action accrues only when the defendant's negligent conduct is known.") (citing *Nolan*, 85 Ill.2d at 179). Even if her doctors conclusively stated that her Ehlers-Danlos caused her complications, Stark would still have an obligation to "inquire further as to the existence of a cause of action." *Hoffman*, 327 Ill.App.3d at 1011 (citing *Witherell*, 855 Ill.2d at 156).

Stark knew that she had severe complications resulting from the eroded TVT-O mesh that was implanted in 2007. She was aware the she had a "failed bladder lift" shortly after her 2007 surgery, and she was informed of the eroded mesh on several occasions in May 2008, February 2010, October 2015, and November 2015. Although it is possible that, at the beginning, Stark "believed that her chronic condition was related to some natural cause, as time passes such a belief becomes less credible." *Orso*, 2009 WL 249235, at *5.[8] By November 2015 at the latest, Stark knew or should have known that her injury was wrongfully caused. She was thus obligated to investigate whether she had a cause of action. Stark's claims became time-barred two

---

[8] *See also Hoffman*, 327 Ill.App.3d at 1011 ("To determine when a plaintiff reasonably should have discovered that an injury was caused by defendant's wrongful conduct, courts look to the nature of the injury itself; the more obvious the injury, the more easily a plaintiff should be able to determine its cause.").

years later in November 2017, yet the suit was not brought until September 2018.[9] The Defendants are entitled to summary judgment.

Having determined that all of Stark's claims are time-barred, the Court declines to reach the remaining arguments on the merits.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion for summary judgment [58].

E N T E R:

Dated: April 20, 2020

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge

---

[9] As Defendants note, Stark's strict liability claims (Counts II and III) are additionally barred by the Illinois statute of repose. 753 Ill. Comp. Stat. Ann. 5/13-213 (b), (d). Section 213(d) imposes an eight-year bar to strict liability personal injury actions, running from the date of injury.753 Ill. Comp. Stat. Ann. 5/13-213(d). "This eight year repose period is 'an absolute cut-off point beyond which no action can be brought regardless of whether the plaintiff knows of the damage or not.'" *Dohra v. Alcon (Puerto Rico), Inc.*, No. 92 C 2624, 1994 WL 71449, at *2 (N.D. Ill. Mar. 3, 1994) (citing *McLeish v. Sony Corp. of America*, 152 Ill.App.3d 628, 630 (1st Dist. 1987)). For products liability actions, the date of injury is the date of exposure, ingestion, or implantation surgery. *See e.g., Zimmerman v. Abbott Labs, Inc.*, 189 Ill.App.3d 744, 745 (1989). Stark's TVT-O mesh was implanted on February 15, 2007. The repose period expired eight years later on February 15, 2015, yet Stark's suit was not filed until September 2018. Accordingly, the statute of repose bars the strict liability claims.